Good morning, my name is Carl Shear, I represent Gherkin Paving, and I would like to reserve five minutes for rebuttal. The defendant, Lasalle, furnished a motion for, provided, or submitted a motion for summary judgment and submitted one affidavit. That affidavit was from a person who was the president of the corporation, Scott Nemechek, but he was not on the job daily and had no real activity dealing with the issues on the job. The major problem was that Gherkin was paving in conditions when it should not have been paving. Gherkin submitted three affidavits, Mike Zweier, who was running the job, John Yocum, who had bid the job and was managing the job from the office, and Mandy Gherkin, who addressed issues of damages. The one point that I did not make clear in my brief, I was distressed with the wrong and so many legal issues wrong, but she took the motion and decided the case. What she was to do was to decide whether or not there was a genuine issue as to any material fact, and that was the issue that she would decide. But it looked to me as though what she really did was she looked at what Gherkin submitted and she looked at what Lasalle submitted, and she went through the facts as she saw them, and she decided the facts, the factual facts of the case, and that is not within the scope of what she is supposed to do. Certainly within the scope of deciding a summary judgment motion if her conclusion was that there were not any material facts in dispute. If there are no material facts in dispute, yes. What is interesting to me from the case is that when the affidavit was submitted from Lasalle, from someone who was not on the job, and when the affidavits were submitted from Gherkin, Gherkin's affidavits explained everything that happened on the job, from start to finish and to the issue of what the costs were and what the damages were. And the judge had that? Pardon me? The judge Bittani had that, right? She had that. Sure. She did. So what is the shortcoming then? The shortcoming is that our affidavits were uncontroverted. There was no objection submitted to any affidavit that was furnished. There was no motion to strike. All of the exhibits that were furnished with the affidavit were allowed without any objection whatsoever. And so the cases presented in the affidavits from Gherkin Paving were essentially uncontroverted facts. And she is saying even accepting all of those facts as true, I find that under the contract there is no right. I mean, she didn't find the facts. She didn't discard your facts. She accepted them as true, correct? I don't think she, my impression was that she didn't review the affidavits submitted by Gherkin. Did those affidavits go to the question of whether the contract requirement that claims for increases in the contract price had to be in writing and at the latest prior to starting the work involved? Did your affidavits go to that issue? They did. How? Well, the problem that presented itself was the fact that we were paving at a time of the year when we should not have been paving. Okay, but you had a contract that laid out what was supposed to happen. Did you make any effort under that contract to amend the contract to take care of the problem? Well, we followed the contract. And from our perspective, the contract had language in it that allowed us to address the problem. What we were supposed to do was to give notice of the fact that we have a problem. And then we're supposed to, during the time when we have the problem, we're supposed to alert us out of the fact that our costs are increasing. The first thing that we did was to have a letter that was acknowledged every day that we're paving in unsuitable conditions. The second thing that happened was But that didn't go to money, did it? There was no effort there to adjust the contract price. There was not. That's correct. That letter did not. So you don't have written requests to change the contract price. It was a fixed price contract. Correct. But the next thing that happened was that on the 28th and 29th of November, we went to LaSalle with a request for additional funds because of the problem that we were having. And so they prepared a field directive. And the field directive was, the language used in the field directive was picked by LaSalle. But our testimony was that that was a field directive that recognized that we are operating on a time and material basis each day and that we are entitled to additional money. And they recognized that on the 28th and 29th and signed the field directives. But the problem is, it's not a question of whether you were treated unfairly. I mean, it appears to be that the contractor asked you to do things and made promises and didn't keep them. Correct. I mean, but what can we do about that if the contract requires written activity by you and the contractor decides to hold you to that contract, regardless of how obnoxious that might be? Because we did what the contract required. The contract requires a notification in writing of a problem. There was notification in writing on Well, it doesn't say notification in writing of a problem. It says notification in writing of a request for an increase in the contract price. Yes. And let me read you the contract provision that we complied with. The contract provision is in Section 5.6 of the contract. But what about the last sentence of that provision that says that you still must request increases in contract price in writing? Well, let me read the sentence. And I want to tell you how we complied. OK. The sentence says, if the work is to be performed on a time and material basis, this detailed pricing must be submitted within five business days from the completion of the work. So on the 28th and 29th, we have an acknowledgment from LaSalle that we're working on a time and material basis to address the fact that the work site is unsuitable. They know that on that day. And they promised to pay us. On the next day, we submit, and this is the testimony of Mr. Zweier in the affidavit. He stated that we furnished them with a record that day of the additional quantity of asphalt that was used that day. And we did that every day thereafter for the next seven days for the balance of the work. So they have in writing every day from us. But what you don't have from them is any, well, you don't do, the contract, whoever you said, gave that to, was that just somebody on the job, not a management person? Oh, it was the man managing the job for LaSalle every day. It was submitted to, I forget the name of the gentleman. You considered him someone in authority to bind LaSalle? He was the person, yes. You see what I'm saying? He's not the president. He's not the person who signed the contract with you. But that's a question of fact as to whether he was or he wasn't. If he's the person who's there every day on the job, and he's the person we report to, and he's the person who's accepting the information from us, there's a question of fact as to whether or not he's authorized. And we gave that every single day. And it's uncontroverted. What do you have from him? Pardon me? I'm looking for what you infer from that, that that was authorization for additional pay. No, it's just we're complying with the contract. We're furnishing the information every day about how much additional asphalt we're using because they promised us that they would pay us for it. And then after we had done that, at the end of the period Where's the promise? Pardon? Where's the promise that they pay for it? The promise that they pay is in the contract that they signed. The contract says, and I'll read it again, in 5.6 it says, if the work is to be performed on a time and material basis So you have one field directive that you say allows time and material for the entire contract? No. It's the fact that they understood that the only way that they could pay us for this work is on a time and material basis because we could not anticipate in advance of doing the work what the cost would be. But there's clearly only one field directive that's in the record, correct? Correct. And that field directive is specifically limited to a particular circumstance at a particular time frame? Yes. And that's the way it should have been handled, but they refused to do that. That's another question of fact. Our position is we ask for additional field directives and they refuse to do it. Okay. So what happens to 5.4 of the contract? Well, let me finish with 5.6. 5.6 says that this detailed pricing must be submitted within five business days from completion of the work. So each day we're giving them the additional asphalt that we're placing. And at the end of doing the work on December 15th, we know that we're finished and we're calculating what our total contract additional cost is for the placement. And on the 20th, within five days, we send them a letter saying this is the additional cost. Right. But that provision of 5.6 is in response to a field directive. Those obligations to submit within five days is supposed to be in response to a field directive, is it not? All of, yes. Well, no. The provision says that we are supposed to give the detailed pricing within five days of completing the work. So each day that we work, we tell them that this is the additional asphalt that we're placing. They know what our prices are for quantities, but we meet the obligation of this provision that on December 20th, we send them a letter, which I think was Exhibit 7, and that letter says, here's the additional cost for the asphalt that we've been placing. So we meet the obligation of this provision. They know it's time and material because when they gave us their first, when we went to asking for it, they gave us a time and material field directive. They refused to give us any additional. So we did what we could do, which was to give them the amount of asphalt additionally that we're placing every day. That's an uncontroverted allegation in the affidavit. And at the end of the period, as this provision requires, within five business days, we're less than five business days, the 20th was not quite, it's five days after the 15th, but we had additional time because there's a weekend in there. So within the time limited in this provision, we gave them a complete summary of our additional pricing, our additional cost, which was the detailed pricing. We met the obligation of the contract to the letter. And the court refused to consider that. And I'm not sure that you're understanding me, but this is a difficult contract to read and a difficult contract to deal with. And my answer, Judge, to your question is that 5.4 doesn't govern this. 5.6, this one sentence in 5.6 governs. It's the only sentence that governs. And we met this, the requirements of 5.6, the sentence I'm reading you, we met the requirements of that sentence to the letter. And to, well, I'm, that's my time, sir. Thank you, counsel. Thank you. Good morning. May it please the court, Kelly Kammer on behalf of the LaSalle Group. As an initial matter, there's no dispute that Michigan law governs this matter. And furthermore, there's no dispute that under Michigan law, the clear and unambiguous terms of a contract must be enforced as written. Here, as your honors indicated, this is a fixed price contract, which its terms govern the relationship of the parties. But there was a window within the contract that counsel just told us about that you could adjust the price. The contract certainly sets 5.6. Well, all of 5.6, Article 5 deals with changes or claim procedures for the contract. 5.6 is one provision of the contract dealing with those issues. So it does allow for price changes. I mean, we know it's fixed price, but now we're going to talk about the detail. Certainly, absolutely. There's a very specific procedure set forth in the contract for price changes. Now, you just heard your brethren here lay out why he's convinced that they did meet the contract terms with respect to this additional asphalt. Will you address? I did hear that. And I, of course, do disagree. Certainly, you can't carve out one sentence of the entire Article 5 and indicate that that's the only sentence. None of the other sentences apply. But does that sentence bear any weight? Well, first of all, there are a couple of steps here. And number one, when you look at the provisions of 5.2 and 5.4, there has to be an agreement in writing between LaSalle and Gerken prior to Gerken performing the work or starting the work at issue that, indeed, Gerken will be paid extra compensation for that particular work. Well, that says there has to be that agreement in writing before the work begins if, in fact, there's to be an increase in the contract price, so the fixed contract price. But that's different from a field directive in 5.6 that says or the like, which could be just an oral directive that would contemplate that we're asking you to do more that goes beyond the subcontract. Absolutely. And we're asking you to do more and we're going to pay you for that more. And even in the situation where it's not an extra work or a change, but we're asking you to do more as you're indicating, Gerken is still obligated to, within five days of that request, act or omission, whatever it may be by LaSalle, Gerken is obligated within five days to submit a written claim for that change for the additional increase in compensation. And they said they did that. They did not do that. No document has been produced wherein Gerken says, LaSalle, we're going to use extra asphalt due to the cold weather. What letter do you know, Mr. Scheer, to be referring to? Sure. Let's talk about that. There are a couple of letters. There are, I believe, two letters. The first letter is a November 20th, I believe, letter or somewhere around that date of 2007. In that letter, Gerken indicates to LaSalle that because temperatures are going to be below 40 degrees, Gerken cannot be responsible for warranting the work because they can't. That isn't the letter. I don't think that's the letter counsel just mentioned to us. Well, the other letter that he's referring to is a December 20th letter. And that letter was but within the five to seven day time range under 5.6. Well, first, again, is it within the five days? They submitted a letter within the five days. So what's the problem? Point us to what's the shortcoming of what we've just been told. Absolutely. First of all, the letter was submitted in five days. It was a letter. There was no supporting documentation. The problem is, it's a letter rather than a what? What should it have been instead? There should have been detailed price information, supporting documentation showing how overages were incurred in the asphalt. And that's important, but very critical to this inquiry is this is the first notice that LaSalle got of these alleged asphalt overages. Gerken at no point on the project requested LaSalle to authorize an increase in the quantity of asphalt used. What should we discount what we're told about the field directive and the gentleman on the job who knew and they notified him each day? Are you telling us that that matters not? With respect to the field directive, the field directive was for a very, very specific area. It was laid out exactly on the plans, you know, from the shed to X point. And it capped the time materials for that particular section of the project at $4,000. 5.6 isn't limited to field directives. I think that what Judge Cook is talking about is the allegations that appear by affidavit that the LaSalle representatives on the site knew that additional asphalt would be needed and authorized the use of it, directed them to use the additional asphalt. And 5.6 says and the like. What is that supposed to mean? It doesn't refer specifically to field directives. One would think that that could reasonably encompass oral directives on the site. Again, there's nothing in the record indicating that LaSalle authorized additional asphalt. Nothing absolutely has been produced to that effect. And again, So that's what your point, that's where you'd like to hang your hat, is that the affidavit, there's no proof of what they're saying in the affidavit, yet counsel points out that the affidavit's unrefuted. Well, no, the affidavit, what the court relied upon was the contract. It relied upon the deposition testimony of Gherkin's representatives. Gherkin's representatives testified at their deposition, their area manager, Mr. Yochum testified that nothing was submitted to LaSalle while it was on the project asking for additional asphalt. Nothing. No request at any point. The December 20th letter is the very first time anything was submitted. I said no written request was submitted, but he said that it was understood on the job. I mean, how does a construction project work? You're on the site, you realize that you need additional asphalt because you've been pushed into a new time frame. You expect everybody to go home, sit down, and write letters to each other? Well, understood, Your Honor, but I think what's very telling in this case is Gherkin did go home and it did sit down and write letters. Every single day that Gherkin asserts that the paving, the weather was out of spec, it wrote a letter to LaSalle. It said, it's below 40 degrees, LaSalle, we can't warrant the work, and we want you to sign off on this to say that you'll warrant the work. They wrote these letters each day, yet there was zero mention in any one of these letters that also we're going to be using extra quantities of asphalt and you've authorized us to do it. It would have taken three more clicks on the typewriter on the computer to put that sentence in there. If that was the case and Gherkin was so very concerned about using the extra quantities that it now asserts, it certainly seems- It could have done it that way. They absolutely could have done it that way. You make a point that they could have done it that way, and the question before us is, but the way they did do it, does it suffice? Absolutely not. By the field directive and working with the gentleman on the job? Well, there's no field directive. There's no field directive. I think what we have to do is we have to look at Section 5 in total. Which very specifically says, unless otherwise directed by contractor in writing, any increase or decrease in the subcontract price resulting from any changes shall be agreed upon in writing by the parties hereto in advance of performing the work. Therefore, unless otherwise directed by LaSalle in writing, Gherkin and LaSalle had to agree in writing to any contract price increase before Gherkin started the work. 5.4 further specifically provides any claim for an increase in the subcontract price based upon contractor's written or verbal order or other act or omission- Is there a difference between an increase in a subcontract price, meaning a price for a given set of work, and an increase in work that therefore might result in a time and material increase? That's very different. Yes. There are two different things, and that's exactly what- Right. So I think we need to be looking at 5.6. Well, we're not talking about an increase in the subcontract price for the given set of work. We're talking about additional work. Respectfully, Your Honor, 5.4- Outside the bounds of the contract. 5.4 specifically addresses that by stating whether it's an act or omission of contractor, not necessarily extra work. As I was indicating, it's either based on the verbal or written order of LaSalle or another act or omission of contractor, which could be LaSalle saying, hey, you need to continue with your paving. And by the way, this is all based contract work. Gherkin was responsible for this paving. It wasn't extra work, as Your Honor is indicating. What 5.4 requires is, again, whether it's a change order or not, the request for compensation must be made by subcontractor to contractor in writing within five working days from the date of the claimed order, act, or omission. Did the original subcontract contemplate an amount of asphalt? Well, what it does is Gherkin, based on the bid documents that it's Now, LaSalle doesn't necessarily know what Gherkin's planned quantities are. That's something that Gherkin would do internally and obviously proceed accordingly. Now, in this case, Gherkin's bid documents were extremely limited. I think they produced two pages in response to LaSalle's discovery requests. And it's also important to note that for the days that were above 40 degrees, Gherkin's representatives testified and acknowledged that indeed Gherkin did go over its planned asphalt quantities on those days as well. So every single day that Gherkin was on this project, it exceeded what it had expected to use. So when you're looking at 5.6 and the very first sentence of it, well, the first sentence that I'm looking at, I'm not sure that's the first sentence of the whole section. To the extent that LaSalle requests that extra work be performed, your position, as I understand it, is LaSalle wasn't requesting any extra work. It was simply a question of how much material is it going to take to perform the work that Gherkin bid on and got the contract for. Correct, Your Honor. My position is no extra work was requested. Certainly, there was a... So would that mean, in your view, that 5.6 doesn't apply at all here? I don't believe 5.6 is the ethical section at all, Your Honor. I believe that we look at 5.2, 5.4, and 5.5. But even if 5.6 applied, Gherkin still has not complied with its requirements. Part of the problem is that it sounds like you're making a lot of factual arguments, and we are in a summary judgment context, are we not? We are. So how could we resolve all of these facts in a summary judgment context? Your Honor, because the contract is very clear. We can talk all day about what Gherkin says LaSalle said or what Gherkin says LaSalle did. The point is, pursuant to the contract, a writing was required. Gherkin never submitted a writing. Its representatives admitted that in their deposition testimony. So the material facts are undisputed. It doesn't matter whether a conversation took place on the site. And that's the point. I mean, this is the whole reason that the contract is structured the way that it is, is so that we avoid this he said, she said. That's why a writing is required. LaSalle, as a general contractor, certainly can't go and build a project and after a subcontractor is done, the subcontractor comes back and says, hey LaSalle, we used three times as much materials as we expected to use. So will you pay us an extra $200,000? That's simply not how it works. But the contract itself said that the site would be ready for them to lay the asphalt before a particular point in time when the temperature would drop. And the site wasn't ready. That's correct. But the general contractor instructed them to go forward anyway. Well, first of all, the site wasn't ready. You are correct. There was a delay of approximately two weeks, maybe three weeks. And that was the only testimony on the record was a believed soil issue that was the owner's issue. There was no testimony that that was LaSalle's fault, that LaSalle had anything to do with that. Gerken has asserted that that slight delay was somehow a material breach by LaSalle. However, all of the case law says unless LaSalle took some affirmative act or knew that the site wouldn't be ready, that's not on LaSalle. That's not a substantial breach by LaSalle. LaSalle did everything it could to move the project forward. But that takes Gerken outside the bounds of the original subcontract, does it not? Well, the parties agreed to proceed. Gerken agreed to proceed. It certainly took pains to make sure that it did not have to warrant its work on all the days that the temp was out of spec. But it proceeded with the work and pursuant to the contract. If Gerken had not proceeded because it was pretty clear that there was going to be a problem with temperature, would LaSalle have taken the view that Gerken was in breach? Well, what LaSalle would have done is probably hired a replacement subcontractor to perform the work and that if they could perform the work within that contract price, it would be a non-issue. If it exceeded or there were other issues, you know, I'm speculating, of course, but I presume that's exactly what would have happened. Thank you. Thank you. Rebuttal? Just briefly. We understood the contract and we understood the need to get things in writing. And when we were asked to pave in unsuitable conditions, we alerted everybody to that fact and they acknowledged in the writings that they signed that we were paving in unsuitable conditions and we tried to get a writing the first day that we're paving in unsuitable conditions and they gave us one. They gave us a field directive. They gave us for additional money, time and material for the work that we're doing. This is extra work when you're paving out of spec. And so we're there and we're working. So the next day we come to them and this is all in the affidavit and we try to get another field directive. They said, no, don't worry about it. We'll pay you. So we follow up every day with, that's Exhibit 6, every day with a statement of how much we're over every day. And then we get to the end of this and within the five days we send them the writing that's been criticized. That's Exhibit 7. It is detailed. We have Type 1 and Type 2 asphalt. And we say as to Type 2, we're 1,067.59 tons over at a price of $54.25 per ton for a total of 57,916. And on Type 1, we're over by 665.44 tons at a price of $55.50 per ton for a total amount of 36,931.92. How much more detailed can we be? We're giving the tons over, the price per ton and the total. There it is. And we did it within five days. And we tried to get writings every day, but they wouldn't give them to us. Do you maintain that the 5.6 controls that? Yes. Okay. And as you heard Judge Batchelor ask, the paragraph begins with that it controls situations where extra work, a request for extra work be performed. Correct. Is this extra work? Yes. Why is it extra work? The work you contract, that's where I get hung up here. The work you contracted to do was to pave this whole area. That was the work. Now the materials, you were supposed to estimate that. You did. You put in a bid. You were clearly wrong, even in good weather, you were clearly wrong. So the bid wasn't accurate. Judge, we weren't necessarily wrong in good weather. We may have been in trouble in the first two days that we're paving and we're adjusting to the site that we have. And so we ran over a little. But that doesn't mean that we didn't estimate correctly. It just means that getting started on the first couple of days, we ran over a little bit. Well, at least there were some problems with the estimate relative to some good weather, as well as the problems which cropped up as a result of the bad weather. But I don't understand why there isn't a distinction under 5.6 between extra work and extra material. Let me explain to you why it's extra work. When we planned to do the work, we understood that we would be paving in accordance with the Ohio Department of Transportation specifications. And they tell you specifically that you're going to pay within a certain temperature range and that you're not going to pay within another temperature range. When LaSalle comes to us and tells us that we're going to be paving on frozen ground, this is not the contract that we agreed to. This is extra work. This is something new. And we didn't ask for money for the additional labor. We didn't ask for the money for additional equipment time. We could have. The whole job got bigger. It took longer. It was harder work. You had two weeks to renegotiate when they said it's going to be two weeks later. I'm just wondering why that situation didn't prompt some written exchanges that would protect your client. It did. We got the field director. That protected us on the first day. Oh, no, I'm talking about before you begin. The site wasn't right until two to three weeks later. Because we're there and they're there and the owner wants it paved and we're going to get it done because we're going to help them get it done. And they know that we're going to have additional costs because they're signing these acknowledgments. And you're hoping that they... No, we didn't hope. On the first day that we're paving out a spec, they did give us a field director for additional funds. And they said, we'll give you more. And then they didn't because they weren't going to. So they made a promise and we did what the contract required before we started work on the first day working out a spec. We got a field director to pay us additional funds. And the next day, we're mobilized. We're there. We're working. We expect to do the same thing the next day. No, we're not giving it to you. So we gave them the total quantity over every day. And when we're all done, we gave them the December 20 letter. Which shocked them. Pardon me? The number shocked them. I don't think it shocked them. No? No. No, they fully expected getting something like this. They just don't want to pay. All right. Thank you. Thank you, counsel. Case will be submitted. Clerk may call the next case.